May it please the Court, Kevin Maldonado on behalf of the appellant's plaintiffs in this action. Before you today, Your Honors, is a case regarding CERCLA. CERCLA was enacted by Congress as a liberal statute to encourage cleanup of environmental contamination throughout the country. At the heart of CERCLA is a cost recovery mechanism that allows recovery through indemnification and contribution actions that are liberally construed to promote cleanups of the environment, to encourage people to come forward and volunteer to clean up, and to avoid years of protracted litigation forcing potential... Never done that, has it, Counsel? No, we have not, Your Honor. So here we are, 14 years after the commencement of this action, fighting over whether or not the parties that contaminated the site have liability under CERCLA. The district court decisions below put a stake in the heart of the indemnification contribution rights of my client, who is an innocent landlord who voluntarily committed to clean up the environment, who has been forced to litigate extensively to go after the people who created the contamination at the site. At the core of this argument today is whether or not the decision in Commander Oil was properly interpreted by the court below. Commander Oil allows a landlord to hold a tenant responsible as an owner under CERCLA if certain indicia of ownership are met. It's respectfully submitted that the court... You're not happy with Commander Oil, I gather. I'm sorry, Judge? You're not happy with Commander Oil? I am. I'm not happy with the way it was applied by the court below. I thought one of your points was that we should overrule Commander Oil. There's a split in the circuits regarding Commander Oil, Judge, and I think that the Ninth Circuit and Sixth Circuit perhaps have it correct, but I think the current controlling law in this circuit is Commander Oil. And I think when you apply the facts of this case to Commander Oil, there really should be no doubt that liability should be had by the defendants as owners under the Commander Oil standard. If you look at the five enumerated points... Can you tell me what the theory of Commander Oil is? That is, what's the theory of applying these non-exclusive factors? Is it to avoid a situation where there's a subterfuge or some other theory? No. There's a lot of cases, Judge, where throughout the country where control or a tenant's control of the property where they put a subtenant in creates ownership liability under the statute. The theory is that when a landlord steps back, relinquishes control of a site, or in the case of Commander Oil, gives up so many rights of ownership to the tenant, that that tenant should be responsible for the acts of its subtenant. So Commander Oil seems to have rejected this idea that it rests entirely on a theory of site control. Commander Oil walked away from the theory of site control. So give me another theory pursuant to which I can understand Commander Oil in a way that helps your side. I think what Commander Oil is saying, it was a Second Circuit's attempt to say, Judge, that when a landlord gives up so many rights to a tenant, that the tenant has basically stepped into the shoes of the owner. That tenant should be held responsible. Stepped into the shoes of the owner. Okay, with that in mind, why don't you take us through the factors? Why don't you take us through the factors with that theory in mind? I will, Judge, and I'll be happy to. So Commander Oil sets forth five factors, the first being the term of the lease and the tenant's rights versus landlord's right to use the property. In this case, Judge, there's no dispute that the term of the lease was 20 years versus a five-year term in Commander Oil, significantly longer. Defendant's own experts deem this lease to be a long-term lease. So there should be no dispute that it's a long-term lease. Isn't this a standard, ordinary lease, triple-net lease, commercial lease using a Blumberg form lease with all the standard terms and conditions of any major commercial lease in the State of New York? It's not a standard lease, Your Honor. I beg to differ. It's a Blumberg form, right? And I looked at it. I used to litigate about these things. It's a Blumberg form, right? The first four pages are, and attached to that is 70 pages of additional. There's always riders to the Blumberg form. Most commercial leases don't have a purchase option. Most commercial leases don't give the right to their tenant to assign and to sublet a property without landlord consent or notice. Those are not standard provisions in a lease. Didn't your client acknowledge that this was a typical lease in the proceedings below? No, Your Honor. On more than one occasion? No. No? No. We've acknowledged that the commander oil, we've argued that the commander oil factors, which I was about to go through, if you take all five of the factors that are enumerated, our lease clearly satisfies four and a half of those criteria. In addition to the enumerated factors in commander oil, there's the example given by the Second Circuit and commander oil of a long lease was 99-year term, right? That's one of the examples, yes. Okay. And this was a 20-year term non-renewal? 20-year terms. After the term expired, it would be a month, a month. But that's standard New York law. If the tenant holds over, it's month to month. There is no renewal term in this lease, right? There's no renewal term in the lease. There's a purchase option. And in year 12? In year 12. Okay. Which you never got to, as I recall, because the landlord bought back the property prior to the 12th year. Excuse me, Your Honor. I'm sorry. There were three rights to terminate in the lease, one being default of the tenant, two being a fire loss or combination of the property, and then if they exercise their option. In the first six weeks, there was also a termination. Yeah. It's sort of irrelevant. The fact of the matter is, in year, I don't know, 9 or 10, there was a fire and the landlord took back the property. So it wasn't even a 20-year lease as it worked out. It was a 9- or a 10-year lease. Right. And the point, though, is, Your Honor, I think the very important point is the lease provides that the landlord just can't terminate the lease. There needed to be an intervening event before termination could take place. In this case, those intervening events were very limited. What's the difference between no tenant would sign a lease and put in the investment in a property in a triple net lease situation if the landlord could just willy-nilly terminate the lease? How does that differentiate this lease from any other lease? There are circumstances when the landlord can terminate. Otherwise, the tenant is entitled to the quiet enjoyment of the property. There are leases, Your Honor, that provide that termination may take effect when the landlord sells. There are leases that provide a number of leases. But that's an intervening event, right? Just like a fire. There are a number of leases that just provide the landlord the right to terminate. And there's a number of leases that provide the landlord with no right to terminate, which tends to be more akin to turning over the property to the tenant and having the tenant stand in the shoes of the landlord to use your language, right? That's correct, Your Honor. When you go down the facts, though, four and a half of them, I believe, fit squarely with what Commander Royal said. Then the three facts in dicta also fit squarely. The benefit of the sublease went exclusively to the defendants in this case. The plaintiffs, my landlord plaintiff in this case, didn't receive one penny of the additional benefit of the sublease to the subtenant. The defendants in this case received 100 percent return on their investment in terms of the rent by subleasing. That was to their benefit. My client had no ability to consent or deny the sublet. My client had no ability to supervise the activities that were being conducted by the subtenants. The question is whether the tenant is the de facto owner, right? That's correct. That's essentially what Commander Royal asks. Aren't there a whole list of things that the tenant can't do or that it's required to do here? It can't alter the site without owner's consent. It can't encumber the sidewalk. Limitations on posting signs. Limitations on use of property. There's a whole slew of limitations. How is it then that you can argue that the tenant is, in essence, the owner? If you compare the limitations and the rights that were granted in the Commander Royal case versus the rights and limitations that were granted in this case, it's starkly different. For example, in Commander Royal, the landlord reserved the right to use the office space, to use parts of the property. In this case, that didn't happen. They do reserve the right to inspect the property at any time. Yes. That was one of the rights reserved. Thank you. You have some time for rebuttal. Thank you. Can I ask you a question right off the bat? There is something in the record about a release that was signed in 1976, and there's nothing in the briefs about that. Yes, Your Honor. Is there an argument here that this whole action is barred by release? Yes, Your Honor, there is. And we made that motion. And the magistrate judge, Magistrate Judge Lindsay, said she denied that motion for summary judgment because she said that there was a need for a trial on that issue, in effect. So that issue is, if it went back, that issue would still be alive. But there is a release. And, you know, Judge McMahon, you put your finger on, I think, a central issue here. If you want to look at who has the greater indicia of ownership, this is a valuable lease. Northern State Realty Co. wanted that lease very badly, and they sued Next Millennium or Spiegel, their predecessor, and they lost. And their lease was terminated. The lease required them to put in pay premiums. The landlord collected the $880,000, rebuilt that, and is now, I think, making $2.5 million. That's the insurance process. Yeah. Now making about $2.5 million a year. Your point is that is the best indication of ownership. I would seem so. I mean, and you look at some of the other issues that bespeak that difference in power. The landlord can alienate the property, the critical concept of title. He can alienate the property at any time. The tenant, Northern State Realty Co., could not. It was always on the hook until the landlord either rejected them or threw them out. It was also on the hook during the sublease. I mean, that was a condition on any sublease. The landlord didn't have to approve the subtenant, but the tenant had to remain fully liable, right? Correct. What about the transfer tax point? Well, the transfer tax point comes up in the exchange of experts, and it seems to me that the plaintiffs' appellants make the argument that because they had an interest in an option, that that was something that could trigger the transfer tax. That was their argument. Some rebuttal to that. And our position on that is, you know, you have an interest in that. You have a tax on an interest in property. It's not this determinative of whether or not you have more indicia of ownership than the title owner. You know, I'd like to just say a few things. I say I'm running, time is running, and I'd like to say a couple things about how this case comes together because there are some other issues. Now, this is a case with one purpose, to get into the coffers of the ADCAM Corporation. And in furtherance of that, the appellants have invoked a well-known rule that CERCLA was intended, amongst other things, to make the polluter pay. However, there are two, there are several limitations on that, not the least of which is the very basic concept that ADCAM Corporation never manufactured anything at 89 Frost Street where the perchloroethylene was released, never used perchloroethylene. Mr. Riesel? Result. Did your client or clients not settle with the State? We settled with, the State never sued us. We were the one few parties that weren't sued, and that's why we weren't before the court when the case was here before. However, when the State brought a natural resources defense case and we were, we had a lot of third parties who were suing us. We tried to bring ourselves within that umbrella, and we settled for a nuisance value. We had to really move to be a part of the case. And so if you look at there, there's some arguments that seem to fit within Commander Oil. One question is, was this appropriate, an appropriate case for summary judgment, or should there have been a trial with a fact finder weighing the evidence on both sides? Both sides moved for summary judgment. Both sides moved for summary judgment on this issue. And I think the facts are developed. We have this thick lease. We have two expert reports from very credible experts that we put in. Their expert did not take on the central concept that this was a typical lease. And the only evidence of that is the facts. There were some differences between the experts on the two sides, right? Yeah. Well, there were some differences. And the expert on the plaintiff's side testified, I think, to the ultimate question. And the ultimate question being who had the majority or the majority of the indicia of ownership. Now, this is, when we look at this case, this is a different case than what you've seen before. It's not Pasalacqua. It's not, you know, it's not Judge Chin. It's not your first energy case. It's not all these cases that involve this massive pollution from the manufactured gas plants where one individual, remember, it's Hobson and Mangy, they contract with service corporations to run the operation at the utility. They're operating the utility. Now, here, there is zero proof, zero, zilch. This is an ownership case. And if you are an owner, there's strict liability, right? Yeah. Oh, but Judge Chin, there's another issue here. And that is that the plaintiffs want to pierce the corporate veil. And they want to argue, they argue that there is essentially a single enterprise and the Pufall brothers were direct, were using ADCAM to operate Lincoln Processing, which there's no proof of. I mean, and, you know, and there are several attempts to do that are a little bit upsetting. You know, for example, on page 14 of Appellant's opening brief, they suggest that property was exchanged back and forth without consideration. And they quote, and they quote the corporate lawyer, Elliot Miller. Miller was testifying, and you can see this in our footnote 15. Miller was testifying that when Northern Real Estate Corp reorganized into a partnership, it really made no difference because the three stockholders became the three partners. But there's no, I don't see any data where ADCAM, which had developed this business of manufacturing tape, and the one connection, it had two connections, pardon me, it had with Lincoln Processing was that it sold Lincoln Processing some glue or some emulsion. And Lincoln Processing did some, was a bigger, more ebullient, ongoing corporation. They were manufacturing. Kagan. But you're sidestepping the point. The point or the argument being that this was all one big operation, the Poofall Empire, and all that's left of the Poofall Empire may be ADCAM, but there it is. But, Judge, that is, I don't think I'm sidestepping that. I'm attacking it from a different point of view. I think the plaintiffs have to prove that the Poofalls, in executing their empire, caused ADCAM, we're looking at ADCAM's pockets, caused ADCAM to influence and operate to convert Lincoln Processing into a shell. And there's nothing like that here. And, you know, the, and, you know, and parents, you know, say, well, we're entitled to a trial on this issue. And they say, here's the most telling point, the most telling point. And that is the 1969 survey, 1969 survey. This is, you know, the Poofalls had an outside accountant come in and look at the accounting procedures. Now, that's not something that you would think of shell operators would do. And the first 29 pages deal, of that exhibit, deals with accounting procedures, the bookkeeping, and Lincoln Processing. And then it looks, and in that it says, there's a real example of bad bookkeeping here. ADCAM sells glue or emulsion to Lincoln Processing. And they're doing it in a way where we think there's a better way to account for it. They were selling batches every month. They would bill them, and they didn't have invoices. Well, this case, you know, has 10 years of discovery, 10 years of discovery. John Poofall, the nephew who ran ADCAM, testified, you know, we sold, you know, I set the price after negotiations with the rest of the family, and we used as a guide the price of our competitors. So there's an arm's length transaction. The appellant says, you know, bad thing is we used combined financials. We did use combined financials. These were affiliated corporations. But it's the Ford Motor Company, I mean. Yeah, okay. So I pass on. And there are separate financials for each of the affiliated corporations. Mr. Riesel, may I go back to the ownership liability issue? Sure. Would it make a difference if under the lease, forget about whether it's a typical lease, because I believe that really part of the idea is whether the lease represents some sort of subterfuge, but would it make a difference that the landlord had no ability under the lease, the terms of the lease, to inspect or do anything on the property at 89 Frost? That certainly would be a factor. Why is that a factor? Well, because the landlord had one of the inherent rights of the landlord is to make sure and take care of his property. So, I mean, he had a right to inspect. He had a right to inspect. That could be a dispositive factor. Well, no, I don't think it's dispositive. Why not? Well, you have to look at the entire entity. So I believe he had a right to inspect. He had a right to go in and make repairs. No, I understand that, but I'm giving you a hypothetical. If the landlord had no right to inspect and go in and look at the property and the tenant could block the landlord from conducting an inspection, why wouldn't that be a dispositive factor? That would be a strong factor. That would be a very strong factor in establishing that the tenant had the most of the indicia of ownership. But as Judge Walker says in Commander Oil, you look at this and you balance it out. And when you balance this out. Of course, but some factors are more important than others. Yes, and a right of inspection is he had a right of inspection. They had a right to go in and default. They had a right to bring in tenants at the end of the year. All the traditional concepts that a landlord has in a commercial lease. Tenant could not make alterations without permission. Tenant could not. Tenant had an obligation to return the premises in good repair. These are standard lease clauses. And Judge Walker, he was very careful to say when he starts to split this out, very, very careful to say when we look at this, we really have to keep in mind what would be factors that would tip the other way. I think you have to look at those three examples that he gives. Ninety-nine-year lease, sale leaseback, and a tenant, perhaps like you say, Judge, maybe exploiting his opportunity and freezing out the landlord. I see my time is up, and I would like to add just one thing. On Judge Walker, Judge Walker, you know, analyzed the complaint, heard the same complaint that, you know, this means that the landlord is the stuckee. He gets stuck. And, you know, Judge Walker said, this is a narrow tool that we've fashioned, and it is the end that we — CERCLA justifies holding the landlord liable because he benefits from the property. This tenant, this landlord, benefited immensely from the property, and now, after it threw us off, and now wants us to pay as if we had succeeded. Thank you. We'll hear the rebuttal. Please, Mr. Court. The only person that benefited from the subletting of the property was the tenant. They put in a tenant who burned down the building, released massive amounts of contamination. We're supposed to look at the relationship between the lessor and the lessee. That's what the decision said. Mr. Rizzo made an argument, though, that you were the only one to benefit. When you say the decision, Commander Oil, is that right? That's right. That's what Commander Oil says. But the benefit here, and what CERCLA says, is you look to the parties that benefit, and you hold them responsible. In this case, the only one to benefit from that sublease were the defendants in this case, and they benefited handily. They benefited to the tune of $67,000 on a $50,000 lease. With respect to your question on the transfer tax issue, Your Honor, their expert was the first to raise it, and he incorrectly raised it in his opinion. He said that because it's not a 49-year lease, there is no transfer tax, and that's dispositive on how this should be treated in terms of a transfer. Their expert was wrong. We pointed that out to him, that a 25-year lease with an option in terms of New York taxation is taxed as a transfer of ownership. How about a 20-year lease with no option? There was no option to renew. Forget about the in the year 12 you could buy. A 20-year lease with no option, how does New York tax law treat that? A 20-year lease with no option to buy is not a taxable event. The option makes it a taxable event in terms of a transfer pursuant to the laws of New York State. With respect to the releases given, Your Honor, it was a limited release given with respect to the fire and issues surrounding the fire. CERCLA didn't even exist at the time that release was given. It's not a foreseeable event. It's a non-event under the release. With respect to the single enterprise liability issue. Yeah. Judge, I think the crux of my argument there is we should have been afforded a trial on that. But what was the evidence, just to piggyback on your adversary's argument, of causation in connection, assumed domination by Adkem? What was the evidence of causation? There's evidence in the record that Lincoln Processing installed a dry cleaning machine that used the contamination of concern at the site, that amounts of that contamination were released into the environment or at least missing from the Adkem. No, but I think that the causation is causation by Adkem where they are using the fact of their affiliation. There was a loose affiliation. Adkem causing Lincoln to do the polluting. Yes. Adkem benefited from the common enterprise. Not benefit. Cause. Listen to Judge Loyer. How did Adkem, where's the evidence that Adkem caused Lincoln to install the machine that you say is the polluting machine? I don't think there's a need to show Adkem's causation. There's a need to show causation in that they operated as a single entity. If we disagree with you, is your answer that there is no evidence of that? Correct, of Adkem's causation. I don't disagree with that point. I don't think it's necessary, but I don't disagree with it. I understand. Thank you.